**BELL TELEPHONE CO., Application of, In re.**

Public Utilities Commission.

No. 24517. Decided December 30, 1954.

## OPINION

For Authority to increase rates and charges and to change its Exchange Rate Tariff, P. U. C. O. No. 1, its General Exchange Tariff. P. U. C. O. No. 3, its Message Toll Telephone Service Tariff, P. U. C. O. No. 6, its Private Line Tariff, P. U. C. O. No. 1, and its Tele-typewriter Tariff, P. U. C. O. No. 2.

### I. History of Proceeding

On December 18, 1953, The Ohio Bell Telephone Company, applicant herein, filed with this commission an application seeking the authorization of the commission to increase rates and charges for telephone service rendered by it within the state of Ohio. Concommitantly therewith, applicant also filed a petition requesting (1) the commission's approval of a proposed form of the advertisement required by §614-20 GC (§4909.19 R. C.); (2) an order authorizing the introduction in evidence in the instant proceeding of evidence in applicant's preceding rate application, No. 22452 on the docket of this commission; and (3) an order waiving the filing, with said application, of an inventory and appraisal, in accordance with aforecited §614-20 GC (§4909.18 R. C.).

Under date of December 23, 1953, the commission issued an order granting said petition in all of these respects. Publication of the legal notice was thereafter made by applicant as the statute requires and in the form authorized by the commission's order and proof thereof was duly filed with the commission.

Pursuant to the prescriptions of §614-20 GC (§4909.19 R. C.), and orders of the commission, an investigation of the matters set forth in said application was caused to be made by the secretary of the commission and his report thereon was filed herewith on March 3, 1954, copies thereof being dispatched by registered mail to the mayors and other designated officials of the political subdivisions affected by the application.

Objections to the secretary's report were thereafter duly filed by the cities of Struthers, Columbus, Cleveland, Akron, Dayton, Youngstown, Toledo, Canton, Zanesville, Lancaster, Parma, Springfield, and Washington Court House.

This matter was assigned for hearing before the commission at 10:00 a. m., on April 28, 1954; the hearing was resumed on April 29, 1954, and then continued to June 28, 1954.

In addition to applicant and the objectors above named, appearances were made at the hearings by the village of Gahanna, and the cities of Piqua and Maple Heights.

On June 25, 1954, the city of Cleveland filed with the commission a complaint and petition which asked for an annual reduction of not less than $12,000,000.00 in the existing intrastate rates and charges of the Ohio Bell Telephone Company. A number of the other cities joined in this complaint and petition, which was designated as Case No. 24901 on the commission's docket.

After holding a preliminary hearing on the status of this petition, the commission consolidated the application and said petition for purposes of hearing only. Such hearings were resumed on June 28, 1954,

and continued from time to time thereafter, the final argument being concluded and the respective briefs submitted as of October 15, 1954.

It is conceded that all statutory jurisdictional requirements have been met.

Unless the text indicates otherwise, this finding and order will refer to the objectors as the "cities" or "protestants," to The Ohio Bell Telephone Company as "applicant" or "the company," to The American Telephone and Telegraph Company as "American" or "A. T. & T.," and The Western Electric Company as "Western Electric."

A. Secretary's Report.

The secretary's report discloses that the commission's staff had investigated the proposed rate base and the efficacy of the existing depreciation of the plant in service as claimed by the application. The fact that the commission had determined a rate base as of April 1, 1952, made it possible for the staff to reach its conclusions as to values of applicant's plant and property used and useful and as to the existing depreciation thereof without making a detailed field check. The commission's staff made a detailed study of applicant's revenues and expenses, which the report stated to have been set forth correctly in the application.

B. Date Certain and Base Period.

The date certain employed in this rate proceeding for purposes of determining and fixing the valuation of applicant's plant and property, as required by §499-9 GC (§4909.05 R. C.), is July 1, 1953. The base period used for determining the company's revenues and expenses is the twelve (12) months beginning July 1, 1952 and ending June 30, 1953, with such revenues and expenses adjusted to the station levels as of the latter date.

C. Rate History.

Evidence adduced in this proceeding discloses that the proposed rates sought herein by applicant would result in an increase of 6% over its existing rates; that applicant has been granted increases in its rates of 22% since World War II; and. that should the 6% increase here sought be granted, applicant would have realized an aggregate increase in its rates of 28% during this post war period.

D. Quality of Service.

Protestants do not dispute, in fact they acknowledge, the high quality of telephone service rendered by the company (R. 1168, 1408, 1456).

## II. Rate Base

A. Rate Base Proposed by Applicant.

Applicant's proposed appraisal of its plant and property used and useful as of the date certain, July 1, 1953, was based upon a reproduction cost new valuation which had been previously determined by the commission in its order of August 27, 1952, in the preceding Case No. 22452. Gross additions made since the date certain of that prior case were added at cost and retirements made for the same period were subtracted at the appraisal level of reproduction cost new.

The reproduction cost new included only the plant in Account 100.1,

telephone plant in service, as was also true of the rate base determined by the commission in Case No. 22452. The company did **not** claim the right in this proceeding to include **telephone plant under construction** and **property held for future telephone use,** Accounts 100.2 and 100.3, respectively. In this connection, the company introduced in evidence in the instant proceeding the essential evidence upon which the rate base in Case No. 22452 was determined.

From the reproduction cost new of the total property thus computed in the sum of $586,513,000, applicant's appraisal deducted the total depreciation reserve which as adjusted by deducting therefrom the reserve accrued by predecessors in the amount of $6,462,207, as hereinafter discussed, was $117,471,843. This amount was in excess of the existing depreciation of $94,475,882 as claimed by applicant or of $112,-786,450, as determined by the commission's staff. In any event, the record evinces that the existing depreciation was no greater than the latter sum.

The reproduction cost new less existing depreciation **and less the deduction of the amount that the company's adjusted reserve invested in the rate base was in excess of the existing depreciation (City of Columbus v. Public Utilities Commission, 154 Oh St 107, 108, 42 O. O. 186)** was then ascertained to be $469,041,157, to which 91.38% was applied to compute the intrastate reproduction cost new less existing depreciation and less said adjusted reserve in excess of the existing depreciation, the amount thus obtained being $428,609,809.

The separation factor of 91.38% employed to eliminate the portion of the property used in interstate service is not in dispute. In fact, there is no issue as to the separation between interstate and intrastate of plant, revenues or expenses. The commission finds from the evidence, therefore, that the various separations are correct.

To this amount of $428,609,809 the company added the intrastate portion of its materials and supplies and an allowance for working capital in the aggregate sum of $11,132,257, thereby arriving at the sum of $439,742,066 which was proposed in the application to be applicant's rate base.

B. Exclusion from Rate Base of Allowances for Working Capital, Materials and Supplies.

In **Cincinnati v. Commission, 161 Oh St 395, 53 O. O. 304,** the Supreme Court held that the inclusion of allowances for working capital and materials and supplies was improper where the public utility had accrued sums substantially in excess thereof for income tax and other liabilities to be paid in the future. Applicant admits in this case, in view of this decision, which was rendered after the filing of the application herein, its rate base may not include allowances for working capital and materials and supplies, because its income tax and other accruals do exceed such allowances, and that, therefore, the rate base as claimed by it should be reduced by $11,132,257. This results in a proposed rate base of $428,609,809.

C. Existing Depreciation.

The record evidences that the total existing depreciation claimed by the company as of July 1, 1953, the date certain herein, is 16.11%

(R. 138-143; 989-997); that this percent condition thus claimed by the company is .58% greater than the total existing depreciation of 15.53% claimed by applicant as of January 1, 1951. The investigation made by the commission's engineering staff revealed that in the company's determination of its total existing depreciation as of July 1, 1953, it used the same percent for mechanical depreciation, including age, for each plant account or code as it had employed in the preceding case, but that the other elements of depreciation, consisting of obsolescence, lack of utility and inadequacy, were recomputed to reflect the conditions then existing as of July 1, 1953. These latter revisions and recomputations in functional depreciation have resulted in the aforesaid increase of .58% in the existing depreciation by the company.

In the preceding case, the total existing or actual depreciation found and determined by the commission's engineers was 18.65% for all elements of depreciation. In reaching that determination in the prior case, the commission's engineers adopted as proper the findings of the company for the aforecited elements of functional depreciation—obsolescence, lack of utility and inadequacy. In the instant case, the commission's engineers again adopt as appropriate and applicable the upward revision of these same elements of depreciation as made by the company.

In view of the foregoing, the commission's engineers determined that it was reasonable and proper, therefore, that their findings of existing depreciation in the preceding case should be increased to reflect the increase of .58% in functional depreciation as computed by the company in the instant proceeding. For the reasons stated, and upon full consideration of this question, the commission concurs in this determination by its engineers and finds that the total composite existing depreciation of applicant's plant and property used and useful as of July 1, 1953, to be 19.23% (18.65%+.58%).

D. Company's Valuation of Retirements.

The city of Akron contends that in bringing its appraisal forward to the date certain, the company understated its retirements in all accounts, thereby correspondingly overstating the reproduction cost new valuation of its rate base. This contention is predicated upon the fact that the company computed the reproduction cost new appraisal level at which retirements were to be deducted by applying to the book cost of plant retired in a given account the ratio of the reproduction cost new of the entire account to its book cost. It is clear and the record substantiates that this method is entirely correct and proper when applied to the mass accounts which went into the appraisal on exactly the same basis.

However, the use of this appraisal method in valuing the retirements from the location record accounts, those as to which the company's records show the date of installation, may result in some inaccuracies. The city of Akron requested that the company make a study to determine the appraisal level of the retirements in the location record accounts by the application of factors representing ratios of reproduction cost new to actual rather than average book cost. This study was supplied and entered upon the record. It disclosed that the retirements

in these accounts were understated by $500,000 and the appraisal correspondingly overstated. This commission finds, therefore, that the reproduction cost new of Account 100.1 should be reduced by $500,000 for the purposes of fixing the rate base in this proceeding by reason of this error in method of appraisal of the location accounts.

While the commission entertains no doubt as to the correctness of its determination that the alleged error is no greater than $500,000 and that the contention raised by Akron has no application other than to the location record accounts, the commission points to the fact that the evidence shows that in appraising the plant which was in service at the date of the basic appraisal, January 1, 1951, and which remained in service on April 1, 1952, the date certain in Case No. 22452, no effect was given to increased costs subsequent to January 1, 1951, and to the fact that, in the instant case, no effect was given to increased costs between April 1, 1952, and the date certain, July 1, 1953, as respects the large amount of property in service on both dates. Therefore, the plant is, in fact, undervalued by several million dollars, although such additional valuation is neither claimed nor substantiated in detail by the company and, thus, is removed from the commission's consideration for purposes of determining the rate base herein.

E. Western Electric Company Price Reductions of April 1, 1952.

The city of Akron also contends that full effect has not been given in the company's appraisal to price reductions of April 1, 1952, affecting the material prices of certain items of Western Electric Company manufacture.

The undisputed evidence showed that the net result of adjustments as of July 1, 1953, which would give full effect to the April 1, 1952, Western Electric price adjustments together with increased prices and wages between January 1, 1951, and July 1, 1953, would be an increase in the valuation of the property in Account 100.1, telephone plant in service, of approximately $6,000,000 in excess of the reproduction cost new which the company had submitted, according to the uncontradicted testimony of Mr. Paul Reed, the commission's assistant chief engineer (R. 1722-24; 1708-09), who conducted the engineering staff's investigation in this regard.

The company's appraisal does not give effect to any increased costs following January 1, 1951, except insofar as they are reflected in the book costs of gross additions. Moreover, Mr. Wasick, Akron's utility commissioner, testified on cross-examination that in April of 1952, and again in April of 1953, the wages of applicant's construction employees were increased and that wages of craftsmen employed in building construction trades were increased between January 1, 1951, and July 1, 1953 (R. 2128-2130). The record also evidences that there were increases between those dates in freight rates, in the wages of craftsmen employed by conduit contractors, and in the cost of telephone construction materials not manufactured by Western, such as poles, clay conduit, iron wire, anchors and hardware. (Ex. O-2-B in Case No. 22452, pp. 153-4; Ex. 7, pp. 15-6; R. 2129-30.)

It is established upon the record that effect has been given in the

company's appraisal to the April 1, 1952, Western Electric price reductions, and the commission so finds.

F. Deduction of That portion of the Depreciation Reserve in Excess of Existing Depreciation.

The city of Akron makes the further contention that in computing the amount by which the depreciation reserve, invested in plant, exceeds the actual existing depreciation for the purpose of deducting such excess from the reproduction cost new valuation of a utility's plant and property less existing depreciation in implementation of the Supreme Court's decision in the first post-war Ohio Bell rate case, **City of Columbus v. Public Utilities Commission, 154 Oh St 107, 42 O. O. 186,** the reserve should be ratioed to a reproduction cost new valuation level and the existing depreciation (which is already on an RCN basis) then deducted therefrom. (Akron Exhibit 1-6, pp. 1-2)

The company claims that this same contention was expressly raised by the cities, including Akron, upon the second appeal of the 1949 rate case to the Supreme Court and that the court purportedly ruled against this contention of the protestants. **Ohio Bell Telephone Co. v. Public Utilities Commission, 155 Oh St 526, 527, 44 O. O. 467.** The company also claims that if the reserve is to be factored upward to an RCN valuation, then the depreciation expense must also be increased by the same factor because the company could maintain the larger reserve only by the accrual of correspondingly greater annual depreciation reserve expense. This, the company points out, would credit more money to the depreciation reserve; its expense of depreciation would be higher; its base period earnings lower; and, its income requirements greater.

It is true that the cities have advanced substantially this same contention in prior rate cases. It is likewise true that this commission has heretofore denied this contention that the **entire** depreciation reserve should be equated to a reproduction cost new level. The commission is still of the opinion that the entire reserve should not be thus equated because it would be clearly contrary to paragraph 5 of the syllabus of the court's decision in **City of Columbus v. Public Utilities Commission, 154 Oh St 107, 108, 42 O. O. 186,** which reads as follows:

"5. Sec. 614-50 GC (§4905.19 R. C.), provides that moneys set aside in a depreciation fund may be expended in new construction, extensions or additions to the property of a public utility; when so invested that part of the fund corresponding to the actual depreciation of the property takes the place of the lost capital assets of the utility and, to preserve the integrity of the capital investment, may properly be regarded as a part of the capital assets; and **the value of such property so purchased less depreciation** may be regarded as a part of the rate base for the purpose of fixing public utility rates." (Emphasis added.)

The above quoted paragraph sets forth several significant propositions of law, all of which are pertinent to the contention advanced by Akron:

(1) **Sec. 614-50 GC (§4905.19 R. C.),** is interpreted by the court as authorizing the investment of moneys set aside in a depreciation fund in a utility's plant and property.

(2) That portion of the fund, so invested in plant, which corresponds to the actual depreciation of the utility's property is said to take the place of retired property and, to preserve the integrity of the capital investment, may properly be regarded as a part of the utility's capital assets; and

(3) The value of the property less depreciation purchased with that portion of the depreciation fund which corresponds to the actual depreciation is held to be part of the utility's rate base for the purpose of fixing rates and to that extent may be earned upon by the utility.

In the instant proceedings, the company acknowledges that all of the moneys in its depreciation fund or reserve are invested in plant and property, and upon the record herein the commission so finds. This is. of course, the natural result to be expected in an expanding business engulfed in an expanding economy.

Depreciation accruals are paid by the subscriber or ratepayer as part of the cost of service rendered by the utility. The purpose thereof, as stated above by the Supreme Court, is to preserve the capital investment. To the extent such accruals are applied to protect the original investment in plant and property (**plus** cost of removal and **less** salvage value of the retired property), it appears to this commission that the Supreme Court has enunciated the principle that the **value** of such property so purchased may be included in the rate base and the utility is permitted to earn on the value thereof. Thus, if the property purchased with that portion of the reserve has appreciated in value, the utility may earn on that appreciated value of the property less existing depreciation.

A different situation presents itself with respect to that portion of the depreciation fund, which exceeds the actual depreciation of the utility's property, the court stating as follows in paragraph 6 of the syllabus in the aforecited case of City of Columbus v. Public Utilities Commission:

"6. But such 'depreciation reserve,' to the extent that it exceeds the present or accrued depreciation of the utility property, if invested in new or additional property, may not be included in and treated as a part of the rate base."

If such excess may not be included in and treated as a part of the rate base for the purpose of fixing public utility rates, it is the commission's opinion that the court did not intend a utility to earn on the amount to which that property so purchased with such excess may have appreciated in value.

For illustration purposes, it may be assumed that the excess of depreciation reserve over actual depreciation is $1,000,000. While the particular property in which these excess depreciation moneys may have been invested by the utility is not identifiable and cannot be traced, the ratio of the reproduction cost new value of the utility's property to the book cost thereof is determined to be 120%. Thus, the value of the property so purchased with the excess depreciation fund moneys may be assumed to be carried in the utility's RCN rate base at $1,200,000 and, although the excess moneys in the amount of $1,000,000 may be deducted

from such rate base, the utility would still be permitted to earn on approximately $200,000, the 20% in which the value of that property has increased on a reproduction cost basis as of the date certain.

This is substantially the situation with which the commission is faced in the instant proceeding. Thus, it is the commission's opinion that in view of the court's decision in the aforecited City of Columbus case, it would defeat in part the court's rationale and purpose in deducting the amount which the money set aside in the depreciation fund and invested in plant exceed the actual depreciation (that is, the so-called "observed" depreciation) of the utility's property to permit a utility to earn on that amount to which the value of the property so purchased with such excess funds may have appreciated as of the date certain. The commission finds, therefore, such "depreciation reserve," to the extent that it exceeds the present or observed depreciation of the company's property, should be deducted from the company's rate base herein in an amount by which such excess so invested in plant is ratioed to the same appraisal level that the reproduction cost new of the company's property bears to the book value thereof. In the instant proceeding, the record evidences that this ratio is 128%.

In reaching this determination, the commission recognizes that it is a modification of the findings made by it in prior cases in which no part of the depreciation reserve was equated by it in the determination of the rate bases involved. However, the present conclusion was reached after due deliberation and full consideration of the arguments presented by both the applicant and the city of Akron. The commission is of the opinion this finding is in full accord with the Supreme Court's decision in the City of Columbus case, supra, although it fails to meet the viewpoints on this subject of any of the parties to this proceeding.

Moreover, this matter constitutes a question of fact, the determination of which is the duty and responsibility delegated to this commission as the ratemaking body of this state. This was expressly stated by the Supreme Court in its per curiam in the second Ohio Bell rate appeal, **Ohio Bell Telephone Co. v. Public Utilities Commission, 155 Oh St 526, 528, 44 O. O. 467:**

"* * * The single duty and responsibility of the Public Utilities Commission is to eliminate from the rate base new or additional property purchased with excess depreciation reserves. The **amount** and **value** of such property and the **amount** by which depreciation reserves are excessive **are questions of fact** committed by law to the Public Utilities Commission." (Emphasis added.)

G. Reserve Accrued by Predecessors.

Upon the merger of the former Ohio Bell Telephone Company and the old Ohio State Telephone Company in September, 1921, the depreciation reserves as carried upon the books of these former companies were combined and constituted the reserve of the new and present Ohio Bell Telephone Company, in the amount of $6,462,207.

It is applicant's viewpoint that this reserve accrued by the predecessor companies should be deducted from its present depreciation reserve for the purpose of computing the excess of depreciation reserve over actual depreciation on the basis of the Supreme Court's position

304

in the case of the **City of Marietta v. Public Utilities Commission, 148 Oh St 173, 35 O. O. 186,** wherein it held that even though a public utility carried on its book a reserve depreciation account in excess of actual or observed depreciation, such excess should not be deducted from the reproduction cost of the utility property in determining a rate base where the excess depreciation reserve had been invested in capital assets by a predecessor in title to the property and not by the utility whose rates were therein being determined.

While the depreciation reserve funds accrued by Ohio Bell's predecessors have not been claimed by it to have been excessive Ohio Bell contends not only that the Marietta case is determinative of this question but that the same issue was presented to the Supreme Court upon the third appeal to the court of the company's first post-war rate case and that the court found the commission's order therein, which provided for such deduction of this $6,462,207 accrued by predecessors, was not unreasonable or unlawful.

As pointed out heretofore, this matter of the **value** and **amount** of the company's reserve represents a question of fact for the determination of the commission. Furthermore, the applicability of the Marietta decision is questionable (1) by reason of the different facts therein involved which it would appear pertained to excessive reserves accrued by a predecessor in title under circumstances peculiar to its subsidiary relationship with its parent company and (2) by virtue of the Supreme Court's opinion in the first **City of Columbus case (154 Oh St 107, 126, 127, 42 O. O. 186),** which not only distinguished that case from the Marietta case but established the principle as discussed heretofore that depreciation accruals are contributions by the rate payer to the company for the purpose of preserving the capital investment and held that such depreciation to the extent that it exceeds the accrued depreciation of the utility property may not be invested in new or additional property and its value included and treated as a part of the rate base.

This sum of $6,462,207 accrued by applicant's predecessors has not been accrued by such predecessors other than through the medium of rates collected from subscribers and, therefore, is assumed by the commission to have constituted contributions to that extent and for that purpose by the subscribers of the predecessor companies inasmuch as the burden of proof in a rate proceeding is upon the applicant. This initial accrual to its depreciation reserve is acknowledged by applicant to still be credited to the reserve and to be invested in its plant and property. To allow the deduction thereof from the depreciation reserve for the purpose of computing the excess of that reserve over the accrued depreciation simply permits the company to include this sum of $6,-462,207 in its rate base and, thus, to earn thereon although it constitutes that portion of the reserve which is in excess of the actual depreciation.

The commission finds, therefore, that the sum of $6,462,207 represents accruals to the company's depreciation reserve collected from subscribers by applicant's predecessors as part of the cost of service in the absence of any evidence to the contrary; that this sum is a credit to the company's depreciation reserve and is invested in applicant's plant and

property as of the date certain of this rate proceeding; and, that such sum should be included in the company's depreciation reserve in the same manner as any other moneys accrued to such reserve through depreciation expense paid by subscribers.

H. Deduction of "Other Credits" From Depreciation Reserve.

A total of $2,952,103, constituting "other credits," is credited to the company's depreciation reserve, which represents the reserve requirements that the company was ordered by the Commission to post on its books of record when plant and property was acquired from time to time by applicant company. These reserve requirements ordered by the commission are shown as "other credits" by years on commission's Exhibit No. 2.

These bookkeeping credits to depreciation reserve arose for the most part when applicant acquired plant and property from numerous small telephone companies which applicant purchased. Many of these companies did not have accrued accounting but were strictly on a cash basis; therefore, it was necessary to make a depreciation study to determine the amount of reserve requirements of the property thus acquired and the company was ordered by the commission to record on its books the amount so determined. Hence, it may be said that the sum total of $2,952,103 simply represents aggregate bookkeeping accruals and that such sum does not represent depreciation expense collected from ratepayers as a part of the cost of service through the medium of rates.

The commission is of the opinion, therefore, that this amount of $2,952,103 should be deducted from the company's depreciation reserve. and it so finds.

I. Rate Base Determined by Commission.

By reason of the foregoing findings made by this commission with respect to (1) the company's undervaluation of its retirements from the location record accounts in the amount of $500,000, (2) the factoring of the excess of applicant's depreciation reserve over actual depreciation of its property, (3) the inclusion in the depreciation reserve of the sum of $6,462,207 accrued by applicant's predecessors, and (3) the exclusion from said reserve of bookkeeping credits in the amount of $2,952,103.05, the rate base herein determined by the commission to be the proper and correct rate base for purposes of this proceeding is as follows:

| | | |
|---|---|---|
| R. C. N. entire company | | $586,513,000.00 |
| Understatement of retirements | | 500,000.00 |
| | | $586,013,000.00 |
| Intrastate portion—91.38% (separation factor) | | |
| 91.38% x $586,013,000.00 = Intrastate | | $535,498,679.00 |
| Depreciation reserve entire co. | $123,934,050.00 | |
| Less credits P. U. C. O. Ex. No. 2 | 2,952,103.00 | |
| Depreciation reserve adjusted | $120,981,947.00 | |
| Intrastate portion 91.38% | | |
| 91.38% x $120,981,947.00 = | | $110,553,303.00 |

| Adjusted rate base (intrastate) before trending excess of depreciation reserve over existing depreciation | | $424,945,376.00 |
|---|---|---|
| Total adjusted reserve (Intrastate) | $110,553,303.00 | |
| Observed depreciation | 103,064,258.00 | |
| | $ 7,489,045.00 | |
| Excess in depreciation reserve over existing depreciation | $ 7,489,045.00 | |
| Ratio of R C N to book value as of July 1, 1953 1.28% | | |
| 1.28% x $7,489,045.00 = | $ 9,585,977.00 | |
| Additional reserve deducted by trending reserve | | $ 2,096,932.00 |
| R. C. N. rate base (Intrastate) | | $422,848,444.00 |

### III. Expenses

A. Expense of Depreciation.

The city of Akron claims that the company's accrual rates for depreciation are too high as purportedly evidenced by the amount of the company's maintenance charges and by the amount that the company's depreciation reserve exceeds the actual existing depreciation of applicant's plant and property, and that, therefore, Ohio Bell's revenue is proportionately understated. In support of this claim, Akron asks the commission to disallow a portion of the expense of depreciation accrued by the company.

As pointed out on several occasions by the Supreme Court, the subject of depreciation accruals is complex and intricate.

Observed depreciation is the judgment of an engineer in the determination of the actual or existing depreciation of property as of a certain date, so-called "observed" depreciation being synonomous with actual or existing depreciation.

The depreciation reserve, on the other hand, is the accumulated result from the application of an accounting technique for estimating depreciation and has no relation to observed or existing depreciation. Such depreciation accounting represents an attempt to time the assessment of the cost of invested capital with specific annual charges accrued over the service life of the property.

These latter accruals for depreciation are determined for each class of property after a detailed mortality study has been made of each of such classes of property. This study is examined and reviewed in detail by the staff of the Federal Communications Commission and the staff of this commission. The estimated service life of property is based upon experience, and it may be said that the degree of judgment in such estimate is considerably minimized at this time by virtue of the elements of experience adduced upon the passage of each year.

Contrary to the understanding of some, accrual rates are not deter-

mined by dividing the service life into the cost of each unit of property. Consideration must be given to extraordinary repairs, contingencies, cost of removal and salvage value of the class of property involved. Extraordinary repairs include such matters as requirements of public authority and changes in the art of the industry.

For example, assuming a unit of property costs $100.00 and possesses an estimated service life of 25 years, the following could result from detailed studies of experience applicable to that particular property:

| | |
|---|---|
| Cost of property | $100.00 |
| Cost of removal | 10.00 |
| Cost of extraordinary repairs | 15.00 |
| Cost of other contingencies | 5.00 |
| | $130.00 |
| Less: Salvage value | 5.00 |
| Amounts for which accural rates are fixed | $125.00 |

The annual accrual rate for this property would be 5% in order to recoup the cost thereof at the end of its service life.

While Akron claims that the depreciation accruals are too high, it admits that it has not made a study of the company's depreciation accruals.

On the other hand, the evidence adduced in this proceeding discloses that the accrual rates were reviewed by the staffs of both the Federal Communications Commission and this commission after a detailed examination of the mortality studies relating to the various classes of Ohio Bell's property, and that the accrual rates determined therefrom were approved by order of both such commissions.

Commission Exhibit No. 2 shows in this regard the amount of depreciation accrued and other credits and charges to the depreciation reserve for the years from 1921 to 1953, inclusive.

It is axiomatic that in a rapidly expanding plant the depreciation reserve will necessarily be considerably higher than the observed or actual depreciation. This follows because, as in the case of Ohio Bell, its present composite accrual rate of 3.70% is charged to expense the first year and every year thereafter, whereas the actual existing depreciation may not occur, or, at least, will not arise to the same degree in the initial years of a plant's service life. This is acknowledged by Akron. Akron contests only the degree of this excess of depreciation reserve over existing depreciation, contending that it is indicative of excessive annual accrual charges.

On the basis of the record herein, the commission rules against this contention advanced by Akron that a portion of the expense of depreciation should be disallowed by reason of these alleged excessive accrual charges.

The record shows:

(1) The company's depreciation rates at all times have been determined as the law requires, by studies of service life and salvage, as being those rates which would recover the investment in the various classes of plant ratably over their respective lives;

(2) The accrual rates in issue in the 1949 case were found by the commission to be correct and the composite rates here in issue are lower than those contested in the 1949 case;

(3) The Supreme Court affirmed that finding;

(4) The Commission in that case found the company's reserve to be reasonable and correct;

(5) The Supreme Court likewise affirmed that finding;

(6) Subsequent to that case, the Federal Communications Commission, pursuant to law and following studies in which the Ohio commission participated, prescribed the depreciation rates which are presently in effect and were in effect during the base period;

(7) This commission approved by order these same depreciation rates;

(8) Akron has made or effected no studies of the service life and salvage of the company's property to determine what the rates thereon should be.

The commission finds, therefore, that the composite depreciation rates of 3.70% accrued annually by the company are proper and reasonable.

The commission finds it unnecessary, however, to decide the efficacy of the company's claim that prescription of these accrual rates by the Federal Communications Commission is conclusive upon the commission, which, itself, has heretofore approved such rates.

B. Expense of Federal Income Taxes. The Claim That Long Term Debt Should be Imputed.

The commission cannot concur in protestant's claim that applicant's income taxes should be adjusted downward and its income available for fixed charges increased by considering a portion of its existing all-equity capital to be long term debt.

Assumptions contrary to fact should not be made except upon a showing that they are clearly in the public interest. When it is considered that the present applicant is admittedly furnishing excellent service; that it paid off an inherited long term debt by funds most of which were obtained by selling stock, and has an established policy of remaining as debt free as possible, this commission is all the more reluctant to depart from reality for the purpose of imputing to applicant income which it has not received.

A business enterprise which has little or no debt is in a much sounder financial position than its counterpart which for one reason or another may have debt included in its financial structure. The commission believes that the assurance of a healthy financial condition of a public service company over the years is of more importance than the immediate income tax savings, since it is far from clear that debt is advantageous in the long run.

This is demonstrated by the fact that the cities' witness, Hirsch, assumes an interest rate of 3.25% for 33-1/3% debt and a rate of 3.5% for 45% debt.

It is axiomatic that debt increases the risk inherent in any business. For example, if farmer "A" owns a farm valued at $10,000 and said farm is free and clear of all encumbrances, he is in a favorable position if

confronted with a crop failure or other such exigencies to mortgage the farm and secure in that manner funds with which to weather the economic storm. However, farmer "B" who owns a $10,000 farm which is encumbered with a $3,000 mortgage is not in nearly as sound a financial condition when confronted with the same exigencies.

This is forcibly pointed out by events which occurred during the depression of early 1930's. The applicant with its debt free financial structure was able to convert its operations from manual to dial, doing so at a time when the economic savings by way of costs of labor and materials were tremendous. Many other sister companies of the applicant having burdens of debt did not take advantage of economic conditions by converting their operations, the subsequent conversions by said sister companies being made at a later date and at much higher costs.

It is also interesting to note in this connection that the Constitution of this state has a limitation on public debt.

No doubt it is essential for some public utilities to borrow but good sense tells us debt ought never to be incurred unless it is essential. Surely, if an all-equity company is rendering good service at favorable rates, it need not resort to borrowing and it might well be criticized for doing so.

A debt once incurred must be repaid, since regulatory policy does not permit the inclusion in rates for an allowance for debt amortization, a utility which borrows cannot hope to repay otherwise than by refinancing at the maturity of the loan at whatever the then current interest rates may be. Moreover, the income tax laws may not continue over the years to favor debt to the same extent as at present.

It is to be noted that income tax expense is only one segment of a company's total expense. Hirsch compares the applicant with the eleven other largest Bell system companies. The latter companies' total expense per telephone, including income tax expense, exceeds applicant's total expense per telephone by approximately $13.00. Applicant serves over 2,000,000 telephone. If we consider applicant as receiving income which it does not receive by imputing to it an incurrance of indebtedness which it does not have, and thus deny it needed revenues, sooner or later applicant may be forced to incur the debt. Applicant's rates should not be determined in such fashion.

This commission regulates applicant's affairs as the statutes provide but it does not manage applicant's or any other utility's business, nor does it exercise the rights of owners of such enterprises. From what has been previously stated, it is clear that the decision to be debt free is one which any sensible owner or manager might reasonably reach. There is no evidence that this decision was concluded in bad faith. The Supreme Court has said that the mere fact that the American Company owns applicant's stock cannot stand as proof of bad faith. **City of Columbus v. Commission, 154 Oh St 107, 114, 42 O. O. 186.**

Moreover, to impute debt would violate the fundamental principle that in the absence of evidence of bad faith or recklessness, the commission may not set management decisions aside. **West Ohio Gas Co. v. Commission, 128 Oh St 301, 318;** West Ohio Gas Co. v. Commission,

294 U. S., 63, 72; Southwestern Bell Telephone Co. v. Commission, 262 U. S., 276, 288, 289; Commission v. Southern Bell Tel. & Tel. Co., 253 Ala., 1, 42, 42 So. (2d), 655, 674.

Of the rulings referred to in protestants' briefs, a substantial number, hold that debt may be imputed for the purpose of determining the cost of money. The record evidences that applicant's witnesses have assumed debt for that purpose.

The following cases reject the imputation of debt for the purpose of disallowing income tax expenses: Mountain States Telephone Co. v. Commission, July 5, 1954, District Court, Idaho (1954); Re Diamond State Telephone Co., 103A (2d), 304, 324, Superior Court Delaware; and Indiana Bell Telephone Co. v. Commission, 93 PUR (NS) 480, 488, Circuit Court, Marion County.

C. Allocation of Tax Savings From Filing Consolidated Return.

The commission cannot concur with the cities' contention that applicant should be credited with some part of the money which the American Company saved through filing a consolidated tax return. Applicant paid the same taxes it would have paid had it filed a separate return. The only tax liability eliminated was one for which the applicant company was never liable: That is to say, it was neither charged any part of the 2% penalty tax nor given any part of the tax saved. This is patently fair and the commission will not disturb that arrangement between the companies pursuant to which the consolidated return was filed.

D. Supplemental Issues Relating to Expenses.

In previous rate proceedings initiated by The Ohio Bell Telephone Company issues have been raised by the protesting cities with respect to (1) Ohio Bell's license contract with A. T. & T. under which the American Company is paid 1% of Ohio Bell's gross revenues less uncollectibles for the services rendered by American to Ohio Bell under the provisions of that contract; (2) the prices charged Ohio Bell by Western Electric, applicant's supplier; (3) the propriety of the company's employee pension plan; and (4) the expenditures incurred by the company for advertising. In the instant case, however, these and other like expenses are not impugned by the protestants. .

All of applicant's expenditures for the base period have been scrutinized and verified by the commission's accountants. The character of such expenses, as a matter of fact, are shown to be unchanged from prior rate cases except to the extent of the reductions in certain of the Western Electric prices. Moreover, there is nothing disclosed by the record herein to indicate that any of these types of expenditures are other than reasonable, warranted, and incurred in good faith.

The record thus evidences and the commission so finds that applicant's base period expenses to have been actually incurred, that such expenses are reasonable and that they are, therefore, allowable.

## VII. Revenues

Examination of applicant's base period revenues shows them to have been as stated in the company's application and by company witnesses, except for one item: applicant's anticipated revenues were

not adjusted to reflect all of the increase in revenues to be realized by applicant from its increased rates for advertising in the company's classified directory, which newly established rates became effective during the test period.

Applicant contends that the amount of this adjustment would not significantly affect the net result of its anticipated revenues and that the effect thereof would be purportedly far less than that resulting from increased expenses which became effective after the base period.

The record is uncontroverted on this point: The net effect of this additional increase in revenues for classified directory advertising is approximately $150,000 before federal income taxes. Company witness Mott expressly acknowledged this fact upon examination by the chairman of the commission. (R. 2279-2280)

After imposition of federal incomes taxes the net revenue to be realized by the company from the increase of these advertising rates is approximately $69,270.

The commission finds, therefore, that the company's base period revenues for directory advertising should be increased in the amount of $150,000 before federal income taxes and in the sum of $69,270 after imposition of such taxes for the purposes of this rate proceeding.

The record shows that the remainder of the base period revenues are as claimed by the company, and the commission so finds.

### VIII. Rate of Return

Applicant's proposed schedule of increased rates is a company-wide schedule. The exchange rates are banded, i. e., they are at different levels according to the number of telephones in the local service area. All of the proposed rates are determined in accordance with recognized rate making principles. The method used by the applicant company has hitherto received the approval of this commission and has likewise received judicial approval. See Cambridge v. Commission, 159 Oh St 88, 50 O. O. 68; Marion v. Commission, 161 Oh St 276, 53 O. O. 148; Re Ohio Bell Telephone Company, 82 PUR (NS) 341.

While the commission approves the method used in the formulation of the aforesaid proposed schedule, it does not approve the amount of income available for fixed charges, namely, $25,623,604.00, as sought by the applicant therein. It is the opinion of this commission that this amount is not required nor is it reasonable within the contemplation of the law of Ohio.

Applicant offered expert testimony by witnesses Dorau and Martindell on the subject of the current cost of money and the fair rate of return.

The protestants offered expert testimony by witness Wasick, Public Utility Commissioner for the city of Akron, Ohio, and witness Hirsch representing the city of Cleveland, Ohio.

Dorau testified that the current cost of money was 6.50% and that the fair rate of return that the company was entitled to earn was no less than 6.75%.

Martindell testified that the current cost of money to applicant was 6.80% and that the fair rate of return that applicant was entitled to earn was not less than 6.80%.

Witnesses Dorau and Martindell assumed respectively, a 35% and a 33-1/3% debt in the capital structure of the applicant company. This assumption was made solely to enable these witnesses to make comparison with other enterprises whose capital structures include debt.

Wasick testified that the current cost of money on the applicant company's composite cost of capital was 6.224% assuming a 40% debt. He testified further that a reasonable rate of return on an original cost, less depreciation, rate base would be 6.22%

Hirsch testified that the current cost of money to applicant was 6% on a pay-out ratio of 80%.

Protestants' witnesses stated that the cost of money had decreased subsequent to the date certain of the instant case and that inflationary tendencies which were in existence at the date certain were not as pronounced at the time of the hearing, approximately one year later. The commission is of the opinion that consideration should be given to this testimony in the determination of the rate of return to which the applicant company is entitled.

After weighing all of the evidence the commission finds that applicant's present rates and charges are insufficient to yield adequate compensation for the service rendered by it and that such existing rates and charges are unjust and unreasonable within the meaning of the law of Ohio.

Accordingly, the commission, after weighing all of the evidence and being fully advised in the premises, and having due regard to the necessity of making reservation out of income of the applicant company for surplus, depreciation and contingencies, and with due regard to all other such matters as are proper, according to the facts in this case, finds that the rates and charges applied for herein, are excessive and unreasonable in that after paying all of the operating expenses, including depreciation and all other matters as aforesaid, there still remains the sum of $8,223,604 for surplus.

The amount of income available for fixed charges which would permit a surplus in the aforesaid amount of $8,223,604, after dividend payments to stockholders at the rate of 6%, would be equivalent to a pay-out ratio of 67.9%, which, in the light of all of the facts adduced in the instant proceedings is excessive and unreasonable in the opinion of this commission.

The commission is of the further opinion that, in the light of the record herein and with consideration of the additional securities which applicant company will be required to issue by reason of its expansion program, said applicant can meet all of its obligations and charges and fulfill all of its duties as a public utility operating in the state of Ohio, if its income available for fixed charges amounts to the sum of $25,111,298. This said amount will permit the company to meet all of its operating costs, including depreciation, and all such other matters as are proper, and will further permit the payment of reasonable dividends to the company's stockholders and will provide the company with a reasonable amount for surplus.

Therefore, by way of summary, this commission finds the applicant

company's Ohio intrastate rate base as of July 1, 1953, to be $422,848,-444.00; that its income available for fixed charges, after the reductions aforesaid, will amount to $25,111,298.00; and, that the resulting rate of return will be 5.94%, which rate of return this commission finds to be not unreasonable nor unlawful.

Accordingly, increases in applicant company's local service revenues to produce income available for fixed charges in the aforesaid amount of $25,111,298.00, are hereby approved and affirmed.

## IX. Admissibility of Evidence

At the conclusion of the hearing of this proceeding it was stated by the chairman of the commission that all the exhibits offered by the company, the protestants and the commission were admitted in evidence subject to further consideration as to whether the exhibits were properly admissible in the rate increase and rate decrease proceedings, respectively.

Applicant pointed out that it did not object to the admission in evidence of any exhibits of protestants, its objection being directed only to the use of certain specified exhibits and to the use of protestants' oral and written evidence in support of such exhibits and in support of their basic theories. The views which the commission has expressed as to the cities' basic theories of determining rates under the Ohio statutes have been set forth in the within finding and order, the commission having made no use of the exhibits or evidence referred to inconsistent with these views. All of the exhibits, therefore, offered by the cities and the commission in this proceeding are admitted in evidence.

As to the exhibits offered by applicant to which protestants objected, the commission believes it to be necessary to mention only company's Exhibit 31. This was a study made by the exchange rates subcommittee of the National Association of Railroad and Utilities Commissioners of local service telephone rates in effect as of June 30, 1953, in the United States for all Bell system companies except smaller exchanges in Texas, and of those in effect as of the same date in exchanges serving cities of 50,000 population or more (1950 census) in independent telephone companies in the United States. If it has any bearing upon any issue herein, it is only to the extent that it may be claimed to show that the rates of applicant are, generally speaking, at a comparatively low level. There was other evidence on this subject to which there was no objection entered. However, there having been no proof entered upon the record herein to show that comparable conditions and circumstances exist between the communities served by other telephone companies and those served by applicant company, company Exhibit No. 31 is excluded from the evidence. All of the other company exhibits are admitted in evidence.

While it may not be necessary for us to reiterate our earlier ruling, the objection by protestants to the use of applicant's testimony filed in writing is overruled, as it was when made. The validity of the commission's rule providing for written testimony is not challenged and every opportunity to cross-examine has been accorded to protestants, thereby **protecting their rights to the fullest extent.**

The company introduced evidence to which no objection was made showing, since the date certain of this proceeding, that 30 million dollars of value had been added to its plant and that there would be a substantial increase in its wage and salary expense. This was followed by the company's effort to prove that its net earnings for the first six months of 1954 were less than for the last six months of 1953 An objection was interposed by the cities at this point and the commission sustained it. While the evidence is not admissible for the purpose of the commission reaching a determination in the instant rate proceedings on the basis of some date certain subsequent to July 1, 1953. the commission is of the opinion that this evidence is admissible herein insofar as it may relate to the trend of applicant's earnings since the date certain. As our findings have indicated heretofore, the commission has considered this evidence for that purpose only.

It should be pointed out in this connection, however, that the cities' rate reduction complaint is not premised upon any showing of the value of the company's property as of any date certain or upon the company's earnings for any base period. Thus, this latter evidence could well be competent in the rate reduction case for any purpose whatsoever.

Exceptions to these rulings and to the findings and conclusions of the commission contained in this finding and order are reserved to all parties.

### X. Summary of Basic Findings

The following table sets forth and reiterates the essential data as to the commission's findings with respect to the rate base. revenues, expenses, net income and rate of return determined herein:

| | | |
|---|---|---|
| R. C. N. entire company | | $586,513,000.00 |
| Understatement of retirements | | 500,000.00 |
| | | $586,013,000.00 |
| Intrastate portion—91.38% (separation factor) | | |
| 91.38% x $586,013,000.00 = Intrastate | | $535,498,679.00 |
| Depreciation reserve entire co. | $123,934,050.00 | |
| Less credits P. U. C. O. Ex. No. 2 | 2,952,103.00 | |
| Depreciation reserve adjusted | $120,981,947.00 | |
| Intrastate portion 91.38% | | |
| 91.38% x $120,981,947.00 = | | $110,553,303.00 |
| Adjusted rate base (intrastate) before trending excess of depreciation reserve over existing depreciation | | $424,945,376.00 |
| Total adjusted reserve (Intrastate) | $110,553,303.00 | |
| Observed depreciation | $103,064,258.00 | |
| | $ 7,489,045.00 | |
| Excess in depreciation reserve over existing depreciation | | $ 7,489,045.00 |

Ratio of R C N to book value as of
July 1, 1953 1.28%

| | |
|---|---:|
| 1.28% x $7,489,045.00 = | $ 9,585,977.00 |
| Additional reserve deducted by trending reserve | $ 2,096,932.00 |
| R. C. N. rate base (Intrastate) | $422,848,444.00 |
| Income available for fixed charges as shown by company | $ 25,623,604.00 |
| Plus:<br>Adjustment for additional revenues from directory advertising in the amount of $150,000.00 | 69,270.00 |
| | $ 25,692,874.00 |
| Reduction in additional gross revenues requested for local service revenues reduced from $6,009,368 to $4,750,000<br>Adjustment in taxes on said reductions in revenues | 581,576.00 |
| Adjusted income available for fixed charges | $ 25,111,298.00 |

Rate base $422,848,444
Rate of return 5.94%

It is therefore ordered, that the applicant herein, The Ohio Bell Telephone Company be, and hereby is, authorized to file with this commission adjusted tariff schedules for local service that will provide for additional gross revenues in the amount of $4,750,000.00.

It is further ordered, that aforesaid tariff schedules are hereby approved in all other respects and that applicant is authorized herewith to file said schedules with this commission;

It is further ordered that the within order shall be effective forthwith and the company may charge the new rates at the first billing date after the adjusted tariff schedules have been filed by it with this commission.

MARTIN and WINTER, Commissioners, concur.

MOULTON, Chairman, dissenting. While I agree with the conclusions reached by the majority as to determination of the rate base in this proceedings including the findings with respect to trending that portion of the depreciation reserve in excess of existing depreciation, the treatment of Western Electric price reductions, the added reduction from the rate base due to the revised valuation of retirements and the manner in which the depreciation reserve acquired from the predecessor company is dealt with, I cannot concur with the ultimate conclusions reach by the majority in this case and I therefore must dissent to the order which has been entered herein.

The crux of this case is the question as to whether or not the commission is to give consideration in the determination of just and

reasonable rates for the applicant to the fact that the Ohio Bell Telephone Company has an all equity capital structure and therefore is in a unique position among practically all other telephone companies in Ohio and all other utilities as well.

It must be recognized at the outset that the cost of equity capital is much higher than that of debt capital and that, therefore, it follows that the subscribers of the company having all equity capital are called upon for a greater contribution than would be the case if a portion of the company's capital structure consisted of debt. Testimony in this case as to the cost of servicing common stock ranges from 8% to 8½% whereas the estimated cost of debt to this company is placed at 3¼ to 3½%. Another factor to be considered in this connection also is the impact of federal income taxes since interest charges incident to debt capital are deductible items of expense in computing income taxes, whereas of course, dividends on stock are not deductible so that at current tax rates it is necessary for the company to earn $1 in order to have 48c available for dividends or surplus. The question which we have to determine here is whether or not a regulatory body such as this commission should impute a reasonable ratio of debt to Ohio Bell for the purpose of testing the reasonableness of the rates which have been requested.

The company contends that the capital structure of a utility company is to be determined by management and that if the management decides it is to have no debt then the commission must recognize the situation as a "fait accompli" and not ask any questions but provide it with sufficient earnings to service such a structure. The cities on the other hand contend that the commission should pierce the veil which surrounds the capital set-up of Ohio Bell as an ostensibly independent company and look to the fact that all of Ohio Bell's stock is owned by American Telephone and Telegraph, and to the fact that Ohio Bell's corporate policies are in effect determined by its parent company which has imposed a policy of debt free capital upon its subsidiary solely and wholly for its own benefit at the expense of the subscribers of Ohio Bell. Obviously, American Telephone & Telegraph benefits handsomely from the arrangement whereby it acquires all of the common stock of Ohio Bell at par, receives a $7 annual dividend on its investment, and in turn borrows a substantial portion of the funds it uses for such investment at a cost of 3% to 3 1/4%. The most recent bond issue of American Telephone & Telegraph in the amount of $250,000,000 was sold on a bid of $101.9199 for a 3 1/4% coupon, giving the company a net cost of 3.15%. The fact is that the debt ratio of American Telephone & Telegraph is approximately 39% of its total capital and that while it as the parent company indulges in debt financing to its own advantage, it denies the same privilege to Ohio Bell. In weighing the respective merits of these two contentions I find it necessary to give the greater weight to the position of the cities because to do otherwise is to ignore the interest of the subscribers of Ohio Bell and I deem it the duty of this commission to protect and defend their interests. If this commission does not do so, then in my judg-

ment we have failed to perform one of the duties that has been assigned to us.

Ohio Bell's capital structure consists of 3,175,000 shares of common stock at $100 par value, all of which is owned by The American Telephone & Telegraph Company. This, together with an earned surplus of $7,991,550 as of July 1, 1953, brings the total capitalization of the company to $325,491,550. Applying a factor of 91.38% to represent the portion of the investment devoted to intrastate operations results in a figure of $297,300,000 as the capitalization of the company on the date certain, i. e., July 1, 1953. Net operating income for the year ending June 30, 1953 amounted to $21,660,677 which is sufficient to pay a dividend of 6% on $290,000,000 and to permit an accumulation to surplus of $4,097,677, this being on the basis of a pay-out ratio of 81%. Experts for the company have testified that a pay-out ratio of 80% is conservative and reasonable.

For the year ending December 31, 1953 earnings per share of Ohio Bell stock amounted to $7.86 as against a five-year average of $6.13. Earned surplus as of December 31, 1953 amounted to $10,027,856 or $3.15 per share as compared with a surplus of $1.86 per share on December 31, 1952. The earnings per share of Ohio Bell for 1953 of $7.86 compare with the composite average of $7.42 per share for the eleven other principal subsidiaries of American Telephone & Telegraph. Testimony of witness Hirsch was to the effect that a 6% dividend on an 80-20 pay-out ratio afforded a generous return to the company. The company offered testimony indicating that a higher return was required. Hirsch's Exhibit A-20 shows that top electrical utility stock had a yield of $4,83 at the end of the first quarter of 1954 and that during the highest peak of 1953 such stocks yielded no more than 5.5%. Certainly no one can deny that if Ohio Bell stock were on the open market it would be in at least as favorable a position as that of any other first quality utility common stock.

Ohio Bell is a part of a nation-wide system of telephone companies owned and controlled by the parent company, The American Telephone & Telegraph Company, and certainly this commission has a right if not a duty, to see what the other principal subsidiary companies are doing in this matter of capital structure. All of the eleven other principal companies owned by American Telephone & Telegraph have debt—the ratios ranging from 41.2% to 18.2% with a composite average debt of 27.6%. If we assume for the purpose of testing the reasonableness of the application herein that Ohio Bell had a 25% debt, which figure approximates the average debt of the other principal subsidiaries of the Bell system, then the earnings of Ohio Bell on its common shares for the year ending December 31, 1953 would on this pro forma basis have been $10.05 as against the system average of $7.42.

That it is proper for regulatory agencies to give consideration to hypothetical debt ratios in testing the reasonableness of rates has been well established in decisions by state commissions and by the courts. The Supreme Court of New Mexico in a recent decision said:

"Debt ratio is strictly a matter for management, but its evaluation

318

in fixing rates is an item for serious consideration by the ratemaking body." (New Mexico State Corporation Commission v. Mountain States Tele. & Tele., 4 P. U. R. 3d, 33.)

The Maryland Court of Appeals in a decision rendered in 1952 affirmed and approved the following statement made by the Maryland Commission:

"While having no power to direct the issuance of bonds instead of stock, we can say that the consumer should not be required to pay more than he would have had to pay if the company had availed itself of an appropriate debt equity capital structure." (Chesapeake and Potomac Telephone Company v PSC 97 P. U. R., N. S. 50.)

The Supreme Judicial Court of Massachusetts in a recent case had this to say on the subject:

"Debt ratio substantially affects the manner and cost of obtaining new capital. It seems to us that to say the Department could. not even consider debt ratio would be to blind its eyes to one of the elements in the problem before it. From the standpoint of the company, it might be better to have no debt capital at all. An honest board of directors might think so and at least from the standpoint of loyalty to the company's interest it would be difficult to say that they had abused their discretion. Yet the evidence shows that such a decision under present conditions might well double or even triple the cost of new capital and increase correspondingly the burden laid upon the public for obtaining it. Surely, the department could give consideration to this matter." (New England Telephone and Telegraph Company v. Dept. of Public Utilities, 97 N. E. (2d), 509, 88 P. U. R., N. S. 73.)

In a recent decision by the New York Public Service Commission denying in full the application of N. Y. Telephone Company for a rate increase, the commission commented on the fact that the debt ratio of the New York company was substantially less than that of the Bell system as a whole and that this fact should be taken into consideration by the commission. The commission in the course of its opinion said:

"The New York Company's debt ratio is presently substantially less than that of the Bell system as a whole and for the year 1953 was approximately 8 percentage points lower. To reach comparable figures, it would be necessary to average the debt ratio. Any such computation would, of course, again reduce the earnings per share required from the New York Company to pay its proportionate share.

"Since, debt financing, within reasonable limits, is cheaper than equity financing, a lower debt ratio in the New York Company as compared with the Bell system, tends (assuming the same rate of return) to load New York customers with a higher capital cost." (Case No. 16548, dated August 5, 1954.)

As previously indicated American Telephone & Telegraph has debt in its capital structure amounting to approximately 39% and the eleven principal subsidiary companies have an average debt ratio of 27.6%. The company itself through its testimony relating to the cost of money assumes a debt ratio of 33-1/3%. Taking these facts into consideration and being mindful that it is always prudent to keep debt at a conserva-

tive figure, a capitalization for Ohio Bell which would include 33-1/3% debt appears to me to be reasonable under all the circumstances.

With a debt of 33-1/3% and assuming the cost of interest on the debt at 3¼%, the company would have a savings of $1,675,000 in federal income taxes and thus would have a net operating income at present rate of $23,335,677 for the year ending on June 30, 1953, the test period in this case. Interest charges on the assumed long term debt of $99,000,000 at 3¼% would amount to $3,220,000 and interest on advances of American Telephone & Telegraph are $163,000 which subtracted from the net operating income figure given above leaves an adjusted net operating income of $19,952,677 which would enable the company to pay a 6% dividend on the remaining $191,000,000 of common stock and would leave an accumulation for surplus of $8,492,677, an amount more than double that actually accrued to surplus during the test period. This computation results in a pay-out ratio of only 57.5%. If we use the 80-20 pay-out ratio which has been testified to as reasonable and conservative, then there would be enough available to pay a 7½% dividend on the common stock and provide $5,627,677 for surplus which is substantially more than that accrued during the test year. This produces a composite yield on the capitalization of 6.08%. There was considerable variance in the expert testimony on cost of money for Ohio Bell, Dr. Dorau saying it was 6.5%, Martindell 6.8% and Wasick 6.22%, on the basis of 40% assumed debt. The purport of Hirsch's testimony on the subject would seem to indicate his belief that 6.08% is a proper cost of money for this company. Though the yield of 6.08% is somewhat under the figures of the company's experts on the cost of money, I am of the belief that as a practical matter Ohio Bell would have no trouble in securing adequate capital at the 6.08% cost figure since whatever may be said on the subject the fact is that Ohio Bell does not have to compete in the open market for capital. Furthermore, in my opinion the estimate of the cost of debt capital at 3¼% to 3.65% is on the liberal side with a definite likelihood that actual experience would result in a lower rate. Thus at present rates and with a proper reconstruction of the capital structure of Ohio Bell, it appears that earnings are ample and sufficient to maintain the company in a sound financial position. It follows, therefore, that no increase in present rates is necessary when we apply this valid test. A public utility has a duty to maintain a capital structure fair to ratepayers and investors alike and yet sound from business standpoint. If a company fails to maintain such a structure, it is the duty of the commission to consider this fact in determining whether or not an application for increased rates is to be granted. Economy in capitalization is as much an obligation of a public utility as economy in operation.

Rate of Return:

There can be no doubt that under Ohio law due regard must be given to the reproduction cost new of the property used and useful in the furnishing of utility services. The law requires valuation of utility property to be on an RCN basis but the reasonableness of the rate of return is left to the discretion of the commission subject of course to review by the Supreme Court. By applying an inflated rate of return

percentage to the hypothetical RCN value, which itself represents inflation, the result obtained is unjust enrichment of the applicant. With the assumption of 33-1/3% debt for Ohio Bell we find that the rate of return under present rates on the rate base as submitted by the company is 5.44%, and on the rate base of $422,848,444 as found by the majority of the commission, with which figure I agree, the rate of return is 5.52%. Measured by this standard the resulting return is in my judgment adequate and reasonable under all of the circumstances in this case.

For the purposes of evaluating the reasonableness of such a rate of return on an RCN rate base it may be well to here point out what the rate of return presently is on the basis of the actual dollars which the company has invested in its plant. The book cost of the company's plant as of the date certain is $459,355,824, the intrastate portion of which is 91.3% of the total or $419,759,352. Deducting from this figure the sum of $88,317,368 for depreciation results in an original cost less depreciation rate base of $331,441,984 which is the figure comparable to the RCNLD rate base of $422,848,444. Applying to this rate base, representing the actual dollars invested in plant, the net operating income of $21,660,677 for the test year we find that the rate of return is 6.54%. And applying the figure of $23,335,677, the net operating income which results from the imputation of 33-1/3% debt, the rate of return under present rates becomes 7.04%. In terms of these comparisons therefore, it appears to me that a return of 5.52% on an RCN rate base is providing the company a fair and reasonable rate of return. The rate of return of 5.94% on the RCN rate base which results from the order of the majority of the commission is equivalent to a return of 7.58% on an original cost rate base.

The New York Commission in the recent New York Bell case held that a rate of return of 5.91% on an original cost rate base was sufficient and denied the company's request for an increase in rates.

An examination of Wasick's Exhibit 11 for the city of Akron showing actions by commissions all over the country in recent years in fixing rates of return in rate cases indicates that the range of returns allowed where net investment is used as the rate base is approximately from 6% to 6½%. It would appear, therefore, that the present return of Ohio Bell of 6.54% on its original cost rate base which is 5.52% on the RCN base is substantially in accord with predominant regulatory practices throughout the country in recent years.

For the foregoing reasons, therefore, I dissent from the majority opinion granting the applicant an increase in its rates and charges and hold that by the application of valid tests to the reasonableness of the application it has been shown that the present rates of the company are sufficient to preserve its financial integrity and that, therefore, the application for an increase in rates should be denied.